```
 1
 2              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 3                       RICHMOND DIVISION

 4   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                       )
 5   JAMES JENKINS, on behalf of       )
       himself and all other similarly )
 6     situated individuals            )
                                       )
 7   v.                                )   Criminal No.
                                       )   3:15CV443
 8   EQUIFAX INFORMATION SERVICES, LLC )
                                       )   June 14, 2016
 9   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

10

11            COMPLETE TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE M. HANNAH LAUCK
12             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   Leonard A. Bennett, Esquire
     Consumer Litigation Associates
16   763 J. Clyde Morris Boulevard, Suite 1A
     Newport News, Virginia    23601
17
     Kristi C. Kelly, Esquire
18   Kelly & Crandall PLC
     4084 University Drive, Suite 202A
19   Fairfax, VA    22030

20   Lauren K.W. Brennan, Esquire
     Francis & Mailman PC
21   Land Title Building
     100 S. Broad Street, Suite 1902
22   Philadelphia, PA    19110

23            Counsel for the Plaintiffs

24             DIANE J. DAFFRON, RPR
               OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
```

1   APPEARANCES:  (Cont.)

2   Phyllis B. Sumner, Esquire
    King & Spalding
3   1180 Peachtree Street, NE
    Atlanta, GA  30309
4
            Counsel for the Defendant Equifax
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The proceedings in this matter commenced at

2     10:40 a.m.)

3

4          THE CLERK:   Civil action 3:15CV443, James

5     Jenkins, et al. versus Equifax Information Services,

6     LLC.

7          Mr. Leonard Bennett, Ms. Kristi Kelly, and

8     Ms. Lauren Brennan represent the plaintiffs.  Ms.

9     Phyllis Sumner represents the defendant.

10          Are counsel ready to proceed?

11          MR. BENNETT:   The plaintiffs are, Your Honor.

12          MS. SUMNER:   Yes, Your Honor.   Thank you.

13          THE COURT:   Thank you.

14          MR. BENNETT:   Good morning, Your Honor.   May

15     it please the Court:

16          We're here today to ask the Court to

17     preliminarily approve a proposed class settlement

18     negotiated on behalf of a putative class of nationwide

19     consumers who allege that Equifax, a consumer

20     reporting agency, violated 15 U.S. Code 1681g(a),

21     which requires a consumer reporting agency to fully

22     identify the sources of its information.

23          In this case, Your Honor, the source of the

24     information that was challenged was LexisNexis, a

25     private vendor, that reported the public record

1   information in consumer credit reports.

2          The class is gigantic.  It would consist of

3   everyone during the statute of limitations period who

4   requested a copy of their consumer file.  It would be

5   anywhere between one and two and a half million by our

6   estimations - two million is the rough estimate I'll

7   use in this discussion - which means that a class

8   action that proceeded to seek money damages for a

9   willful violation of the Fair Credit Reporting Act

10  would entitle consumers, if we were successful, to

11  somewhere between $200 million at a minimum at $100 a

12  class member to $2 billion, which would dwarf the net

13  worth of this company.  And, of course, that's not

14  counting putative damages.

15         In this case, that caused us to shift from

16  our customary common fund method of negotiating to one

17  that focused on correcting the problem.  It meant

18  because we expected in the negotiation we would not be

19  able to force a cash fund for class members the class

20  members should not have to give up their claims.

21         In this case, we faced - I say this not just

22  publicly now that we've shaken hands, but beforehand

23  as well - as formidable a defense team as we can.

24  The Equifax defense lawyers know the weaknesses.  They

25  know the challenges.  They knew the challenges.  They

1    pressed the buttons in the settlement discussions

2    regarding the proof of willfulness, the fact that the

3    breadth of the class, and the fact that Equifax --

4    shifting to the carrot and the stick, the carrot

5    arguments from Equifax were:  This would fix the

6    problem.  This would give consumers actual monetary

7    value in the form of, as I'll detail in a moment, the

8    credit monitoring, the retail product, and this would

9    serve as the catalyst for industry change both in the

10   courtroom, as we are suing Equifax's competitors for

11   the same class, essentially, as well as in industry

12   practice.

13        That caused us -- it certainly didn't short

14   circuit our negotiation cycle.  We had multiple

15   mediations both before retired Eleventh Circuit Judge

16   Birch and directly before we could agree on much of

17   anything.  The settlement agreement was negotiated

18   down to the last word, the letter, the notice, the

19   choice of administrator.  That's a broad conclusion.

20        The summary of the case, Judge, is that this

21   is a settlement that would not release anything other

22   than the ability to bring this specific claim on a

23   class basis.  It would pay every single class member

24   18 months of a product that is retail sold, not

25   contrived, for roughly $15, and it would reform

1   Equifax's reporting and disclosure practices so that

2   every consumer who gets a report going forward would

3   know the source of that information.  It's an

4   important term because the source of the information

5   has its own set of responsibilities.  LexisNexis is

6   liable under different sections of the Fair Credit

7   Report Act, that consumers can contact the vendor who

8   may have mistakenly reported a judgment as

9   unsatisfied.  A bankruptcy -- in my case, I had

10  TransUnion reported a bankruptcy on Leonard Bennett's

11  credit report ages ago.  Michael C. Bennett, a

12  gentleman, a lawyer up in Pennsylvania.  And certainly

13  the firms that represent the putative class here,

14  Judge, have represented, besides Leonard Bennett,

15  countless, hundreds, thousands of consumers in an

16  individual basis who had public records that were

17  inaccurately attributed to them.

18          It would empower consumers.  Even if we get

19  to fairness and the Court denies approval, every class

20  member will have been told in this process by a notice

21  of the fact pattern that's at issue here so that every

22  class member will now know, all these individuals who

23  requested their file, that LexisNexis was the real

24  source of the public records at issue in the case.

25          At this stage, of course, Judge, there's no

1   opposition.   The standard of preliminary approval is

2   low, but the basic law requires the Court to agree

3   that the case can be certified.

4          Typically, on preliminary approval or any

5   settlement approval of a class, the Court emphasizes

6   or looks at the Rule 23(a) factors, numerosity,

7   commonality, typicality, and adequacy the same way

8   Your Honor would look at it if it was contested.   But

9   the law is that the 23(b)(2) or 23(b)(3) elements

10  are -- the Court has more flexibility so that we don't

11  need to prove that we can manageably present the

12  evidence at trial, for example.

13         We do need to prove that the class is

14  numerous.   It is.   It's millions.   We do need to prove

15  that there are common issues.   And here the claims are

16  common.   The allegation of the incorrectness of the

17  source, the failure to disclose it, the allegation

18  that this was illegal under 1681g(a), and that the

19  conduct was willful on all common issues.   We've cited

20  some of the cases; *Dreher v. Experian*, *Soutter v.*

21  *Equifax*.   The law in this district is pretty well

22  established there.

23         Typicality.   The Fourth Circuit's decision in

24  *Soutter* that initially reversed and remanded before

25  Judge Payne held that you need to explain that we need

1   to have facts that establish the named plaintiffs'

2   claims that are typical of those of the class.  And

3   that's very simple here.  Requested the file.  Had a

4   public record in it.  The source, LexisNexis, was

5   withheld or not disclosed.  The fact pattern here, the

6   facts to establish the named plaintiffs' claims, are

7   typical of those for the class.

8          Inadequacy.  All of these plaintiffs have

9   been with us for quite a long time, even before we

10  filed the cases.  This was a project that's been going

11  on for a while.  They have been responsive.  They

12  vetted and actually approved the specific settlement

13  before we could negotiate its terms to completion.

14         The counsel in this case, I have and my firm

15  has considerable experience in this court and

16  otherwise, but behind me also sit, Your Honor,

17  attorneys for two of the three best Fair Credit

18  Reporting Act firms in the country.  If I can

19  introduce Lauren --

20         MS. BRENNAN:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. BENNETT:  -- who is with Francis &

23  Mailman.  Was my business rival for quite some time

24  until now we've decided it's better to help class

25  members together, but in Philadelphia they have been

1   doing this as long and as effectively as we have.   If

2   the jurisprudence out there is not ours, it's theirs.

3            The fact pattern for this case began ages ago

4   in a case styled *Dennis v. TransUnion*.   That was their

5   win.

6            Your Honor has already, I think, met Kristi

7   Kelly, who is winning all kinds of accolades and

8   quickly pushed Consumer Litigation Associates out as

9   the big firm in Virginia.   We're now the old graying

10  guy who hopes that she'll keep us around.

11           There is no comparable team, without

12  exaggeration, I could have put together that would be

13  as effective at litigating these cases, and I think

14  that that certainly, both the unity and the

15  competence, satisfies adequacy, and it's proven by the

16  fact that we are able to negotiate this particular

17  deal.

18           We've proposed a class notice.   We have tried

19  to reduce some expenses here, but the notice, as we

20  discussed at a 16(b) status update, Your Honor, is a

21  hybrid notice where we will send to electronically

22  verified email addresses.   A number of individuals

23  requested their file and communicate with Equifax via

24  Internet and using a communication domain that will

25  avoid spam blocks and that will show as an Equifax

1    associated communication the way that the previous

2    communications with the class member took place.

3    That's a percentage.  That's a minority.  A

4    significant percentage but a minority of the class

5    members.  And the others, we actually have a direct

6    notice plan.  And that's expensive given the size of

7    the class, and that was a big hold up that held us up

8    from getting to Your Honor our proposed settlement

9    terms on our original schedule.

10           Either way, it's direct notice.  We are not

11   relying on a one-inch ad in the back of a *USA Today*

12   newspaper.  And we have a top flight class

13   administrator that will run the settlement.

14           The data from Equifax as to class members is

15   pretty airtight.  Frankly, when you sue a company such

16   as Equifax, that's the source for a lot of the credit

17   header information, the identifying information that

18   if we were to sue Bank of America, we would rely on.

19   That is, the class administrator would buy from

20   Equifax class member, credit header, or credit history

21   information, identifying information.

22           In this case, we have it directly from the

23   CRA's mouth, so to speak.  And so the notice will be

24   as effective as possible and will certainly satisfy

25   Rule 23(c).

1      The release is narrow.  We don't yet have to

2   convince Your Honor that the ungodly amount of

3   attorneys' fees that we always seek are justified, but

4   we will.  I can answer questions about that, but we

5   will brief it substantially after class members have

6   had a say, unless the Court suggests otherwise.  And,

7   of course, this is an amount that the Court has to

8   approve.  It was negotiated after settlement.

9   Entirely after settlement.  And it is only paid by

10  Equifax, which in *Berry v. LexisNexis*, the Fourth

11  Circuit, as well as this court with Judge Spencer,

12  found appropriate and important.

13      I don't have any other questions for Your

14  Honor unless you have any questions for me.

15      THE COURT:  I do have questions.  I just want

16  to be clear.  You have submitted this proposed class

17  both under (b)(2) and (b)(3).  The proposed order,

18  which is always helpful for me to review, suggests

19  only a (b)(3) certification, and I really want to hear

20  from both of you about exactly what you're seeking and

21  why, which class you think is most appropriate to

22  certify under and why.

23      MR. BENNETT:  Your Honor, as a practical

24  matter, it is because one lawyer made the final edits

25  in one document and not in the other.  That's me.  And

1  so I did not add the 23(b)(2) term into the proposed

2  order, and I would ask to be able to do that.  It's a

3  mistake that I have only now learned that I committed.

4          THE COURT:  So you're seeking certification

5  under both?

6          MR. BENNETT:  Under both.  But it's

7  unnecessary to seek it under both.  The biggest

8  difference between a 23(b)(2) and (b)(3) from a

9  practical standpoint is the ability to opt out and the

10  need for direct notice.  And the law is that with Rule

11  23(b)(2) settlements you don't have to provide an opt

12  out.  It doesn't violate due process because it is

13  injunctive relief that affects the class as a whole,

14  and it is, in addition to that, direct notice,

15  therefore it's not important because there's no need

16  to opt out.  The direct notice is cosmetic.

17          That doesn't mean the Court in a 23(b)(2)

18  settlement will always conclude that.  I could bring a

19  23(b)(2) pure injunction settlement hearing.  Your

20  Honor could say, "I want notice," and you're right

21  down the middle of the plate with case law.  The same

22  is true with the right to opt out.  You do not have to

23  have them, but you can have them.

24          In this case, there is a right to opt out and

25  there is direct notice.  But the injunction is also a

1  big part of what we do.  If the Court decides that we

2  don't need a 23(b)(2) component to it, then we don't

3  need it.  It doesn't add the same effect as it does --

4  it doesn't change anything for class members.

5        What it does from a legal standpoint is it

6  means that if class certification were contested or

7  either sua sponte by the Court or by an objector or

8  intervenor that the standard for certification of a

9  23(b)(2) settlement is different than a standard of

10  certification of a 23(b)(3).

11        Now, with that said, this is clearly

12  predominately a Rule 23(b)(3) settlement because you

13  have a payment being made, albeit not in pennies,

14  dollars, but in the form of the credit monitoring

15  retail product.  You have that payment being made to

16  class members.  You have a release, as modest as it

17  is, that is your ability to bring this specific claim

18  in a class basis again of some nature.

19        The Court in *Berry v. LexisNexis* held that

20  the injunctive relief settlement released statutory

21  damages, and that's not this case because here even

22  those aren't released.  If even in that case, which

23  was much more of an imposition on class members, that

24  the Court could certify a Rule 23(b)(2) settlement

25  despite that there was no right to opt out and despite

1  that direct notice was imperfect.  It was publication

2  in that case.

3          It probably doesn't get us to an end point,

4  Your Honor, but we believe it's predominately a

5  23(b)(3) settlement but that the Court could also

6  certify it if it elected under Rule 23(b)(2).

7          THE COURT:  Right.  It seems a bit of a

8  hybrid, I think.

9          MR. BENNETT:  It does, Your Honor.

10          THE COURT:  So certification under both would

11  not be inappropriate in my mind, but I wanted to be

12  clear that you weren't sort of hedging your bets

13  because the way that your notice or your preliminary

14  approval motion says it could be one, it could be the

15  other.  It wasn't clear to me you were seeking both.

16          MR. BENNETT:  Yes, Your Honor.

17          THE COURT:  So you just indicated it's clear

18  in your papers that there's no monetary payment, and I

19  think you just said it was $15, but it's for the

20  credit monitoring.

21          MR. BENNETT:  Correct.

22          THE COURT:  And it's $15 a month, right?  So

23  it's $270 total.

24          MR. BENNETT:  Yes, Your Honor.

25          THE COURT:  Okay.  So that's the cash

1  equivalent of what the consumers would be receiving.

2      MR. BENNETT:  Yes, Your Honor.

3      THE COURT:  And I'm aware that there's no

4  individual release of claim and that your firm has

5  committed to making your number, or your firms, I

6  guess, my apologies, have committed to making

7  yourselves available by contact information through

8  the notice process or otherwise?

9      MR. BENNETT:  Yes, Your Honor.

10      THE COURT:  And so I guess I want to be

11  clear, have the parties discussed representation with

12  respect to an individual claim?  Are there any

13  potential issues there?  I know that Equifax would

14  never say you can't represent an individual claimant,

15  but I want to be sure that we don't have any potential

16  issues down the way that I should be aware of in any

17  form.

18      MR. BENNETT:  There is no secret contract.

19  If I can step back, the big issue in terms of Virginia

20  ethics, which is what I live mostly by, there's no

21  restriction on restricting yourself from solicitation.

22  There are restrictions, as the Court is aware, on

23  committing not to represent people.

24      There is one niche, and it's really Virginia

25  specific.  It's our specific rule that if the Court

1    approves a prohibition on suing, and it gives an

2    example of a mass or collective action as part of a

3    settlement process, then we can do that.  We've not

4    agreed here.

5            With that said, to give the Court, at least

6    on the record, background is all of our firms every

7    day select who we will represent and who we will sue.

8    Equifax, I can't understate, well, I can't overstate.

9    I can't overstate how significant I think it is from

10   our perspective that Equifax stepped up, acknowledged

11   the problem, worked to resolve it, didn't like to

12   resolve it, but did, and the effect it will have on

13   other class members with respect to TransUnion,

14   Experian, and getting the reports fixed.

15           The way that my firm, I know this is true

16   with my colleagues as well, is when consumers contact

17   us, we will inform them of their rights.  If they have

18   a claim, we will take that case.  We will not be

19   farming those or trying to build new cases against

20   Equifax from these people, but when it comes in, it

21   comes in.

22           But every day, Your Honor, there are cases

23   that don't have a docket number on them where we solve

24   their problem or obtain a cash settlement for the

25   consumers.

```
 1              From our perspective -- I mean, my
 2   understanding is that I will have shaken my
 3   colleague's hand and say that we will treat your
 4   client fairly, and well, and this is not a business
 5   venture for us here.  This is not the purpose of this.
 6              And I can tell the Court that whenever we
 7   have done, and we do it with almost all of these, when
 8   my firm is a contact point, it shuts us down when we
 9   have had large classes like this.  And so we have
10   everybody who works for me, we divide up between
11   individual law firms, almost all our time is spent
12   answering questions, helping people, telling them how
13   to make disputes and the like.  So we expect that we
14   will be a really well paid, if we're effective, group
15   of class action firms on fairness approval and
16   Virginia's best darn pro bono firm hereafter for quite
17   sometime.  It evens out.  That's part of our job as
18   part of that big overpay if we get that way.
19              In this case, Your Honor, I know that doesn't
20   answer the questions.  It's sort of squishy, but it's
21   sort of where we are.  There's not a secret plan.
22         THE COURT:  Right.  Well, I just want to be
23   sure that, you know, it does -- I can tell the amount
24   of work that everybody has put into this settlement.
25   And so I'm aware that any time this kind of injunctive
```

1   relief, certainly when educated by your papers,

2   involves a changing of what kind of information a

3   consumer gets, I presume, without knowing, that that's

4   a major business change and a costly one on behalf of

5   Equifax, in this instance, because often those kinds

6   of changes require computer system changes.  That may

7   not be the case here, and I'll ask you, Ms. Sumner, to

8   address that.  But I'm aware that when any company is

9   involved in large collecting and disseminating large

10  amounts of information, when you change how the

11  information is given or taken in, it is generally

12  costly.

13          So I am presuming that your settlement

14  negotiations didn't just include what I am seeing here

15  but a significant amount of background work about how

16  those systems would change.  And you can disabuse me

17  of that notion.

18          So, really, I just want to -- I have reviewed

19  everything that you have, and I think it is very well

20  put together, but I want to be sure that I cover

21  anything that may be a potential issue.

22          I also want to educate myself a bit.  I'm

23  aware about the *Dennis* case because you all referred

24  to it.  What is the status of the *Dennis* case?

25          MR. BENNETT:  The *Dennis* case was stayed for

1  *Spokeo* and is no longer stayed.

2          It is still?

3          MS. BRENNAN:  Your Honor, it's no longer

4  stayed.  We would file a motion for class

5  certification.

6          THE COURT:  Okay.

7          MR. BENNETT:  The firms that you see here are

8  also now working in *Dennis* and vice versa.  The Court

9  has two cases, the *Clark* cases, with respect to

10  Equifax's competitors.  One of those with Experian.

11  Experian wants to go to mediation as soon as we can

12  get dates, and we are already setting dates.  And the

13  other unnamed entity thinks *Spokeo* is a silver bullet,

14  and we are trying to find a way to disavow of that

15  self confidence before too long.  But I suspect in

16  that other case, the *Clark v. TransUnion* case, the

17  plan is a very rapid, as you will learn shortly, that

18  we plan a very rapid, and the defense knows this,

19  motion for class certification process just as *Dennis*

20  handles their narrow geographic area and *Clark* handles

21  ours.

22          THE COURT:  All right.

23          MR. BENNETT:  So you won't be done with this

24  stuff unfortunately for quite some time.

25          THE COURT:  I just want to be clear.  I know

1    we will deal with fees in the future, but you've

2    suggested an amount, which is significant, and I want

3    to be clear that you all have been careful.  I guess I

4    want to be clear that it's on the record how you all

5    have been careful about separating fees amounts to

6    related cases.

7         So I think you suggest that the amount

8    they've agreed upon has been 2.8 million.

9         MR. BENNETT:  Yes, Your Honor.

10        THE COURT:  And so I want to be sure that as

11   you're putting that information together, that the

12   Jenkins fees are the Jenkins fees and the Dennis fees

13   are the Dennis fees, and that you all have been

14   careful about that.

15        MR. BENNETT:  We have.  And we'll be even

16   more so moving forward as we get to the fairness

17   hearing and the motion for approval of a fee award

18   for not just in this case, but in Dennis and in Clark,

19   if we ever get to the stages there.

20        Behind the scenes, we refer to it as the

21   *Equifax-Dennis* case, and it's been some time that all

22   of our firms have been finding reps, getting reps,

23   putting together the case, and the evidence.  But I

24   think it is fairly easy to differentiate the time

25   spent on this.

1          THE COURT:  I'm sure it is.  I just want to

2     be sure it's on the record, especially because you're

3     referring to these cases as you talk to me about this

4     one, and obviously I think some of the information

5     overlaps what you're talking about and discovering in

6     other issues.

7          All right.  So I think those are the

8     questions that I have of you, Mr. Bennett.

9          MR. BENNETT:  Yes, Your Honor.

10          THE COURT:  I'd love to hear from Ms. Sumner.

11          MS. SUMNER:  Good morning, Your Honor.

12     Phyllis Sumner on behalf of Equifax.

13          I appreciate you allowing me to appear today

14     without Mr. Montgomery, who would normally be here as

15     local counsel.  He had a conflict today.

16          We did put in a lot of time and effort, as I

17     think is clear from the papers.  I would like to

18     mention, and I think I said this to you before,

19     obviously we have had a dispute about whether or not

20     this conduct was a violation of the FCRA.  We are

21     talking about public records.  What we would consider

22     to be the source would be the courts or the government

23     entity from which those records came.  The dispute

24     really was about whether or not there should be a

25     disclosure as to the vendor that was retrieving those

1   records from those public sources.  And, of course,

2   here in most instances that would be LexisNexis.

3           Ultimately, after much discussion, both

4   informally amongst the lawyers as well as in lengthy

5   mediations, we agreed to essentially change an

6   industry practice.  Because, as you know, this is not

7   Equifax alone, this impacts the way that the national

8   credit reporting agencies report public records.

9           And so Equifax did step up and agree to make

10  a change that would ultimately impact the industry in

11  the way that this information is reported.

12          The company also felt in an effort to be as

13  transparent as possible to consumers and to improve

14  the consumer experience that it would disclose not

15  only the source being, for example, a courthouse, but

16  also that LexisNexis was the vendor who obtained those

17  records.

18          And you're right, it is an operational

19  change, and when we are talking about a change that

20  potentially impacts disclosures to millions of

21  consumers, it is not a task that goes without a lot of

22  vetting.  And Equifax does take a look at that to see

23  if it would create other problems because oftentimes

24  what seems like an easy solution to what appears to be

25  a problem can create other problems.  Hopefully, that

1   will not be the case here once this actually takes

2   place and those consumers will receive the disclosures

3   that have this additional information.  But it was a

4   big change for the company, and we did agree to be the

5   first to make this change as part of this resolution,

6   and in addition to offer to the consumers the credit

7   monitoring product which allows them to take

8   additional steps.

9        We don't believe that this is the case that

10  ultimately would result in a lot of individual cases

11  because we don't think it is a case where there are a

12  lot of individual damages that would come at issue,

13  but as part of the negotiations we agreed to separate

14  that out and to leave that option to consumers.  They

15  will obviously receive the notifications either by

16  email or by direct mail, and they through that process

17  will understand what we are doing and that they have

18  additional opportunities, if they so chose.

19       And I think, Your Honor, that primarily

20  answers the questions.  I did want to say that with

21  respect to the attorneys' fees, we separately

22  negotiated all of the aspects of the settlement

23  agreement before even broaching that issue, and then

24  when we discussed the fees, we also discussed that

25  informally and through the mediation process.

1          So we had Judge Birch's assistance in working

2     through that process as well, which ultimately got us

3     to an agreement, and we are comfortable with that in

4     terms of what is being proposed to Your Honor along

5     those lines.

6          So I just wanted to make sure you're aware of

7     that as well.

8          THE COURT:   Thank you.   I appreciate that.

9          I do want to just confirm with you

10    separately, you think that approval is appropriate

11    under both (b)(2) and (b)(3)?

12         MS. SUMNER:   I do, Your Honor.

13         THE COURT:   All right.   Well, I think those

14    are the -- yes.

15         MR. BENNETT:   I do have one other point as I

16    think about this, Judge.

17         THE COURT:   All right.

18         Thank you, Ms. Sumner.

19         MR. BENNETT:   In regard to Your Honor's

20    questions about practice restrictions, and as I'm

21    thinking about this, I made an additional commitment

22    to Equifax, we did, our firms, that we would not

23    initiate a new class action against Equifax in, I

24    guess, a roughly 12-month period.   A big part of that

25    is because of class action fatigue.   Equifax -- we've

1 negotiated *Soutter*.  We've negotiated settlements in a
2 number of other cases that solved problems and paid
3 consumers money and paid us fees.  So that's to be
4 above board.  That was expressly discussed.
5         THE COURT:  That's actually in your papers, I
6 think.  It's part of the reason I was asking about
7 individual claims.
8         All right.  Okay.
9         MS. SUMNER:  Thank you, Your Honor.
10         THE COURT:  Thank you all very much.
11         All right.  Well, I have reviewed your
12 proposed settlement class, and I do make the finding
13 that the proposed settlement is fair and reasonable
14 and accurate and meets the requirements of Rule 23.
15         This class, defined as all consumers in the
16 United States who within two years preceding the
17 filing of this action until the date of the
18 preliminary approval received a credit file disclosure
19 from Equifax containing a public record, meets the
20 requirements under Rule 23 both ultimately (b)(2) and
21 (b)(3).
22         First, with respect to the 23(a)
23 prerequisites, it is the case that this class is so
24 numerous that joinder of all members is impracticable.
25 The estimate is that it could be approximately

1  2 million individuals and that the range, as
2  articulated today, would be 1 million to 2.5 million.
3  Certainly the joinder or individual cases with respect
4  to that is not practicable anywhere with respect to
5  the number of citizens or folks who have received
6  their credit reports are highly numerous.  I think the
7  technical term used by counsel was "gigantic."   I
8  think my children would say "ginormous," but certainly
9  it meets the numerosity requirement under Rule 23.
10         The plaintiffs certainly have the requisite
11  commonality factors.  They are in receipt of a former
12  policy and procedure or proposed former policy and
13  procedure whereby Equifax did not identify the vendor
14  through which it got information.  It is the case, and
15  it's clear on the record, that Equifax is not
16  admitting that this necessarily violated FCRA, but
17  this is a settlement that suggests that they will
18  change their practices.
19         So these consumers did get a credit file
20  disclosure from Equifax.  They requested it.  It was
21  disclosed, and the vendor was not in it.  So that
22  meets both the commonality and the typicality
23  requirements under 23(a).
24         Certainly with respect to adequacy, it is the
25  case that the unity and the confidence of counsel are

1    certainly explained more than adequately within the

2    paper filings.  Certainly this court has seen these

3    counsel on numerous occasions, and the class

4    representatives not only represent the claim

5    appropriately, but they understand and have accepted

6    the obligations that are imposed upon them, and they

7    have adequately represented the interests of the

8    putative class as have the counsel who have worked

9    with them.

10          I do want to ask a question which I forgot to

11    ask.  Do the named plaintiffs receive any kind of

12    bonus payment?

13          MR. BENNETT:  The agreement is that we can

14    ask the Court in fairness for an amount up to $5,000

15    which would be paid, of course, by Equifax.

16          THE COURT:  That may have been in your

17    papers.  I know it's the norm, and I failed to make a

18    note about it when reading it.

19          All right.  So with respect to the class

20    under 23(b)(3) and 23(b)(2), I do think that the

21    proposed approval of both classes are appropriate in

22    this case.

23          Under 23(b)(3), the common questions of law

24    or fact predominate over questions with respect to

25    individual members.  The predominance here involves

1  whether Equifax failed to clearly and accurately

2  disclose the source of the third party vendor as the

3  source of the public records.  The issue would be

4  whether or not that failure to disclose violated FCRA

5  and whether willfulness was involved.

6         So it is the case with respect to

7  predominance, that is clearly met under 23(b)(3).  The

8  class action would be superior to any other means for

9  fairly and efficiently adjudicating the controversy.

10 It is the case that certainly individual lawsuits for

11 a small statutory penalty would be costly and

12 duplicative, but the real issue here is that the class

13 claims outweigh the import of the individual claims

14 with respect to what is the issue before the Court

15 given the nature of the individual claims that would

16 be brought.

17        With respect to Rule 23(b)(2), the

18 certification would be proper if Equifax acted or

19 failed to act in a manner that affected the class as a

20 whole, and certification would be proper if the

21 members of the proposed class would benefit from

22 injunctive relief.

23        Again, the issue that is common to all of

24 these millions of potential plaintiffs involve this

25 failure to identify the vendor and whether or not that

1    is an issue under FCRA, and certainly this is a sea

2    change with respect to disclosure by Equifax, and an

3    entirely new business practice that would involve

4    listing the name and contact information of the third

5    party vendor on reports.  I'm right about that,

6    correct?  It's not just the name.  It's that the

7    consumer can know how to contact LexisNexis.

8                MS. SUMNER:  That's correct, Your Honor.

9                THE COURT:  Which is a significant benefit

10   with respect to what consumers would receive from

11   Equifax.  And Equifax under the proposed settlement

12   would forward disputes regarding public record

13   information to the vendor who supplied it.  This

14   clearly is a significant agreement reached as far as

15   what consumers would have available to them.  And

16   while there is no direct monetary payment, there is

17   the equivalent offer of 18 months of credit

18   monitoring, which is worth $270 per consumer, and

19   there is no waiver of individual claims.

20               I do think this balances the risks that both

21   parties faced with respect to potential litigation.

22   Certainly it is the case that Equifax has not conceded

23   the FCRA violation, and it was prepared to move

24   forward with litigation, and there was risk to the

25   plaintiffs especially as to damages.  Because of the

1   causation issues, it would be difficult for plaintiffs

2   to prove individual damages.  The notice in this case

3   is expensive, and a meaningful cash settlement, given

4   the amount of money that would be at issue, as

5   articulated by plaintiff's counsel here, would be

6   difficult, if not impossible, to effectuate.

7          Certainly Equifax has faced the issue of

8   whether or not it could lose a certification

9   challenge.  It could face damages at trial.  And both

10  parties face the issue of the probability of appeals,

11  the uncertainty of outcome, and the expense of formal

12  discovery.  And it is clear that these parties have

13  engaged in significant informal discovery given the

14  nature of the settlement that involves a change of the

15  business practice by a major company.

16         So as I look to what are commonly called the

17  *Jiffy Lube* factors, the posture of the case at

18  settlement with respect to the fairness of the

19  outcome, there has been significant work that was

20  conducted on the case.  There is ongoing litigation

21  elsewhere in the country which doesn't pertain to this

22  case, but it does go to the risk factors as to both

23  parties at issue here.

24         There has been a significant exchange of

25  informal discovery, which is evident by the nature of

1    the settlement that is proposed.  There has been a

2    thorough investigation of facts and claims also

3    evident via the specificity with respect that the

4    parties represent, the number of potential plaintiffs,

5    the type of notice that's discussed, and the outcome

6    of the case that is proposed.  There has been a series

7    of mediations.

8         There has been three with Judge Birch, is

9    that correct, or two?

10        MR. BENNETT:  Two in person, I believe.  It

11   feels like eight, Judge.

12        THE COURT:  That's fine.  I wrote down three

13   different dates, but there have been at least two

14   mediations with Judge Birch, who is a retired judge of

15   the Court of Appeals for the Eleventh Circuit and is

16   known to this court as having extensive expertise in

17   not just mediation but specifically this type of

18   mediation.  I'm sure he is expert in other types of

19   mediation.  But this court has individual experience

20   with Judge Birch in consumer credit cases, and it is

21   clear that these parties engaged a mediator who would

22   work hard with them and require hard work of them.

23        The nature of the injunctive relief is

24   groundbreaking, as articulated by both counsel here,

25   and indicates a significant amount of work on both

1    sides.   And the fact that there is not an individual

2    waiver of damage claims certainly speaks volumes to

3    the fairness of the proposed settlement whether or not

4    Equifax believes there will be a lot of claims.   It is

5    the case that they are taking that risk.   And that is

6    the product of clearly very hard work, and counsel on

7    both sides that are deeply experienced in this area of

8    litigation and who do numerous consumer actions, both

9    in this court and nationally.   So the fairness is

10   immensely evident with respect to the outcome that is

11   proposed in this case.

12          With respect to the adequacy factors under

13   the *Jiffy Lube* analysis, Equifax has disputed the

14   claims from the date the case was filed and continues

15   today to state that it's not admitting or suggesting

16   necessarily that this is a violation of FCRA, which is

17   one of the benefits of engaging in a class settlement.

18   And, as indicated with respect to the risk that the

19   parties have faced, clearly proving damages and

20   causation is a major risk as defendants could lose

21   certification and have to face damages to a class that

22   is huge.

23          The risk of individual lawsuits, the

24   probability of appeals, the uncertainty of the outcome

25   and the immense cost of formal discovery all indicate

1  that the strength of the plaintiffs' case on the

2  merits is strong enough and the risks are high enough

3  that this certainly is an adequate outcome given the

4  nature of the case.

5          The existence of any difficulties approved

6  for strong defenses that plaintiffs likely would

7  encounter if the case went to trial I think I've just

8  addressed.

9          The anticipated duration and expense of

10  additional litigation is also, I think, addressed by

11  my comments earlier, including potential appeals and

12  formal discovery.  Obviously, any class involves two

13  phases of litigation and possibly interlocutory

14  appeals, all of which go toward the adequacy of the

15  settlement that's proposed to this case.

16          In looking at the solvency of Equifax and the

17  likelihood of recovery on litigated judgment, this has

18  been addressed with respect to the nature of the size

19  of the class here.  Obviously, the potential recovery

20  could be 200 million to 2 billion, and the papers are

21  explicit as to the amount of money that this Equifax

22  entity would have available to it.  And the question

23  is quite high as to whether or not they could have

24  paid a meaningful cash settlement to a class this

25  size.  So certainly the notion of this change of

1    business practice and credit monitoring without a

2    waiver of an individual claim is exactly the type of

3    outcome the class action mechanism is meant to put

4    forward in cases like these.

5           I can't really make a finding yet as to the

6    degree of opposition to the settlement, but it is the

7    case that individual notice will be provided, and it

8    is an opt out class meaning that individuals can

9    choose to opt out, and, obviously, they will have an

10   opportunity to object under the class process.

11          With respect to the notice that is proposed,

12   obviously the parties have put before me the actual

13   notice itself.  It is adequate under 23(c)(2)(b)and

14   (e)(1) and involves direct notice.  The process is

15   detailed and specific.

16          Individual notice will go to each member by

17   email or U.S. mail.  Class counsel has indicated they

18   will set up a website.  They are establishing a

19   process under which email addresses will be gathered

20   and put forward.  Having reviewed the opt out notice,

21   I find that process sufficient also including that

22   individuals can object.

23          The choice of administrator was clearly made

24   thoughtfully.  The fact that Equifax has undertaken

25   the process of paying for the administrator is a

1  significant aspect of the fairness and adequacy

2  findings that I have made, and the release that was

3  involved in this case is narrow.  So I am prepared to

4  make the finding that this proposed settlement is fair

5  and reasonable and accurate.

6      So, obviously, we need to talk about issues

7  of scheduling the fairness hearing.  Obviously, I need

8  to appoint class counsel and approve the manner of

9  notice, all of which I am prepared to do, and certify

10  the settlement class.

11      I do need to talk to you about timeframes for

12  the fairness hearing.  I've reviewed your order.  The

13  one issue would be adding the (b)(2) to the (b)(3).

14  That is in paragraph two of the proposed settlement

15  order, and I guess I would need to hear from you all

16  about other dates and information.

17      MR. BENNETT:  Yes, Your Honor.  Shall I speak

18  from here?

19      THE COURT:  If you could approach, that would

20  be good.

21      MR. BENNETT:  Your Honor, first with respect

22  to the date, the Court has to consider both the

23  practical, the ability to get notice.  Some will get

24  kicked back.  We will be sending new notices.  There's

25  a process to send paper mail, and then to provide an

1   ample opportunity for individuals to object and make

2   their decision as they need to.

3         Then there's the legal concern, which under

4   the Class Action Fairness Act requires that the Court

5   not enter final approval on a class settlement until

6   the relevant government authorities have been notified

7   at least 90 days prior, which puts us to a point --

8   it's actually 90 days from when they receive their

9   notice, which has already occurred, but a 90-day

10  period from today would put us, assuming we started

11  that today, would put us in the middle of September,

12  which from the plaintiffs' standpoint I believe is

13  appropriate.  Ninety days is practical and it

14  satisfies the Class Action Fairness Act, more than

15  does, because the CAFA notice has already happened.

16        With respect to the order, Your Honor, we

17  would propose the plaintiffs work with defendants to

18  get a final proposed order back to Your Honor.  We

19  would add the date that Your Honor orders as the final

20  fairness hearing.  We would also add the class

21  administrator that was negotiated after that paper was

22  first drafted to paragraph 6 and the 23(b)(2) language

23  based on Your Honor's ruling from the bench as

24  paragraph 5(f).  Those last two on page three of the

25  proposed preliminary approval order.

1    My opponent might have their own issues, but
2    that's what I would suggest.
3         THE COURT:  All right.
4         MS. SUMNER:  Your Honor, that's fine.  I'm
5    perfectly willing now to work with counsel to provide
6    a revised proposed order to put that in final form.
7    It also gives us an opportunity to look at our
8    schedules.  I feel a little hamstrung not having my
9    cell phone with me and the ability to look at my
10   calendar.  So we could get back with you with dates.
11        THE COURT:  All right.  Please have a seat.
12   Thank you.
13        I'm sorry.  There is a process through which
14   you can bring your cell phone in, and I'm sorry that
15   we weren't clear about articulating that to you.
16        So I can tell you about dates that I have
17   available in September, and then maybe you all can try
18   to work from those.
19        I have a series of trials already scheduled
20   in September.  I think that I would have available
21   September 21 and the morning of the 23rd, and I can
22   work with you on the week of the 26th.  So hopefully
23   that's enough dates that you might be able to find
24   some time.
25        MR. BENNETT:  I believe so, Judge.  That

1  should probably be fine, Your Honor.

2       THE COURT:  Okay.  In October, I think the

3  best day of the next week would be the 7th if you all

4  have to go in to October, but you obviously can call

5  my clerk and find out any other times, but hopefully

6  that will be enough.  All right?

7       Is there anything else I need to address for

8  you all today?

9       MS. SUMNER:  Not from the defendant, Your

10 Honor.

11      MR. BENNETT:  I would note that Your Honor

12 has a George Mason, or whatever we're now calling

13 them, law intern.  But we call ourselves the Yale of

14 Arlington.  I assume that you recognize the power that

15 a George Mason law student has.  The scrappiness that

16 we're stuck with.

17      THE COURT:  They are young, hungry and

18 scrappy, right?  Anybody seen *Hampton* like I have?

19      Ms. Sumner, do you want to speak on behalf of

20 your own school?  You don't have to.

21      MS. SUMNER:  Vanderbilt.  I'm disappointed,

22 Your Honor.  There is no one here from Vanderbilt

23 today.

24      THE COURT:  I will say all schools here are

25 extremely well represented, as is usually the case in

1  this court.  So I do appreciate your time.  I will

2  tell the interns who are here that this level of hard

3  fought and highly expert class litigation is rare

4  around the country, and especially well done in our

5  jurisdiction.

6          So what you're seeing is the upshot of a huge

7  amount of work, and you should watch the efforts of

8  these kinds of lawyers closely and try to emulate it.

9          So thank you all very much for your time.  I

10  appreciate it.

11          MS. SUMNER:  Thank you, Your Honor.

12          MR. BENNETT:  Thank you.

13          (The proceedings were adjourned at 11:40 a.m.)

14

15     I, Diane J. Daffron, certify that the foregoing is

16   a correct transcript from the record of proceedings

17   in the above-entitled matter.

18

19                      /s/
     _____    _____
20     DIANE J. DAFFRON, RPR, CCR        DATE

21

22

23

24

25