```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
 2                  RICHMOND DIVISION

 3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                         )
 4    JAMES JENKINS, on behalf of        )
         himself and all other similar  )
 5       situated individuals            )
                                         )
 6    v.                                 ) Civil Action
                                         ) No. 3:15CV443
 7    EQUIFAX INFORMATION SERVICES, LLC  )
                                         ) October 28, 2016
 8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

 9

10

11        COMPLETE TRANSCRIPT OF FAIRNESS HEARING
           BEFORE THE HONORABLE M. HANNAH LAUCK
12             UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15    Leonard A. Bennett, Esquire
      Matthew Erasquin, Esquire
16    Consumer Litigation Associates
      763 J. Clyde Morris Boulevard, Suite 1A
17    Newport News, Virginia   23601

18    Kristi C. Kelly, Esquire
      Kelly & Crandall PLC
19    4084 University Drive, Suite 202A
      Fairfax, VA   22030
20
      James A. Francis, Esquire
21    Francis & Mailman PC
      Land Title Building
22    100 S. Broad Street, Suite 1902
      Philadelphia, PA   19110
23
                Counsel for the Plaintiffs
24
                DIANE J. DAFFRON, RPR
25              OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT
```

APPEARANCES:  (Cont.)

Phyllis B. Sumner, Esquire
Zachary A. McEntyre, Esquire
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA  30309

John W. Montgomery, Jr., Esquire
John W. Montgomery, Jr., Attorney PLC
2116 Dabney Road
Richmond, VA   23230

       Counsel for the Defendant Equifax

1          (The proceedings in this matter commenced at
2    2:00 p.m.)

3

4          THE CLERK:  Civil action 15CV443, James
5    Jenkins, et al. versus Equifax Information Services,
6    LLC.

7          Mr. Leonard A. Bennett, Mr. James C. Francis,
8    Ms. Kristi C. Kelly, and Mr. Matthew J. Erasquin
9    represent the plaintiffs.

10         Ms. Phyllis B. Sumner, Mr. John W.
11   Montgomery, Jr., and Mr. Zachary A. McEntyre represent
12   the defendant.

13         Are counsel ready to proceed?

14         MR. BENNETT:  The plaintiffs are, Your Honor.

15         MS. SUMNER:  We are, Your Honor.

16         THE COURT:  All right.  We're here for the
17   final approval hearing.  So I'll hear from you, Mr.
18   Bennett.

19         MR. BENNETT:  Thank you, Judge.

20         Good afternoon, Your Honor.  May it please
21   the Court.  We move for final approval of the
22   settlement that this court has already had an
23   opportunity to vet really, I would say, ex parte, that
24   is, were no objectors at that time.  Since that point
25   there have been rounded to roughly 10 objectors.  Of

1    those, in our papers, we pointed out that a couple of

2    them have confirmed to us but not formally that they

3    do not press their objection, but given the

4    opportunity to appear here today, and the fact that no

5    objector has, we are confronted just with the written

6    objections that the Court has before it.

7         Two of the individuals were either attorneys

8    or attorney-drafted acknowledged.  Mr. Bezer, Adam

9    Bezer, represents that he had help writing his, and

10   it's actually, I think, a solidly drafted objection

11   for a pro se.

12        And Mr. Sweeney, as well, is himself an

13   attorney.  We have not had personal contact with any

14   of those individuals.

15        We also have not had personal contact with

16   Mr. Donahue, who's one of the other more vocal

17   objectors.  We have attempted to have personal contact

18   with every other individual, particularly those, the

19   majority of these, who criticized Equifax or the

20   credit reporting industry or the public records

21   generally to try to explain their circumstance, and

22   not simply to deal with their objection, but to make

23   sure they knew of other rights and remedies that they

24   had under the Fair Credit Reporting Act.

25        And that is what this case is largely about.

1  This case was an attempt, successful attempt, by this
2  plaintiffs' team over a course of four cases over
3  multiple years, this one filed in July of '15, and
4  others long preceding, to get all three credit
5  reporting agencies to empower consumers with the
6  knowledge that their public records came from someone
7  other than the courts.  They came in this case, in all
8  instances, from LexisNexis, and to enable those
9  consumers to make direct objections as appropriate to
10 LexisNexis, and to enforce their rights under federal
11 law knowing who the defendant is and should be, to
12 Equifax's credit, which I can say now that we're in
13 settlement posture.  We're all friendly now, but a
14 significant number of the public record errors that
15 occur in credit reporting are caused by the
16 transposition or the reading or evaluation of those
17 records by LexisNexis.  And the credit reporting
18 agencies have a relationship with LexisNexis that will
19 continue past this and the other cases, but consumers
20 do not.  They are not like Bank of America or a
21 mortgage company where the consumer knows who to go
22 to.
23        There are rights under the Fair Credit
24 Reporting Act even if plaintiff lawyers can't make
25 money because there's no private cause, 1681S-2A,

1   against furnishers.  Consumers have a right to make

2   direct disputes.  Consumers have a right to demand

3   certain information from furnishers directly.  This

4   settlement empowers them to do that.  It does not

5   disempower.  It does not take from consumers the right

6   to enforce other remedies under the statute.

7           The release here, as the Court may recall and

8   as our papers point out, releases practically,

9   functionally nothing by the class.  The only release

10  is the right to bring this exact claim again as a

11  class action, which under 1681(b)(2), I'm sorry, under

12  Rule 23(b)(2) is more than appropriate.

13          We have an injunctive relief order that we

14  have proposed.  We have changes that are to be made.

15  And the ability to bring a class for the exact same

16  fact pattern is not something that any of the

17  objectors have raised a concern about.  Everyone that

18  has raised a concern about giving something up

19  incorrectly believed that they were giving up their

20  right to prosecute a claim against Equifax for

21  inaccuracies or to do something against whoever

22  reported a public record.

23          So in this case, our greatest achievement is

24  probably not just the injunctive relief, it is

25  probably the narrow release that we have.  It is as

1   narrow a release as we've been able to negotiate in
2   any one of my major class actions opposed by quality
3   defense counsel.  And we have that here.  And we
4   accomplished that narrow release.

5           We, in exchange for giving up the ability to
6   bring this same fact pattern, which no one other than
7   these firms have prosecuted before, the class has an
8   opportunity to activate, without a claim, 18 months of
9   credit monitoring, a product that I advocate publicly.
10  A product that is sold at a retail price of just shy
11  of $15, and for 18 months without adding a credit
12  card, without any ability of Equifax to reactivate for
13  the 19th month.

14          Class members have not just assess to a
15  credit report, but assess to credit reports at every
16  minute of the day.  If they get up in the middle of
17  the night and they have a nightmare and they want to
18  check their credit file, they can do it.

19          As they work through and progress to change
20  their credit reporting, if there's anything wrong with
21  it, they can constantly upgrade and check and update.
22  In addition, they can obtain the scores, which are not
23  permitted or not free under federal law.  Any consumer
24  has to pay for those.  They are free to these class
25  members, to 3 million class members.

1        In addition, there's other benefits.  There's
2   identity theft insurance.  I don't want to speak too
3   poorly of my opponent here now that we're less than
4   adversary at this one moment, but these class members
5   with this product, Judge, will have a direct contact
6   at Equifax.  We'll have somebody -- as part of that
7   product, if you were to buy the service for the $270
8   subscription, you actually get a direct contact at
9   Equifax, not someone overseas, and not a robotic
10  computer or otherwise.  And so it is a valuable
11  product, and it is a product that is provided to class
12  members in exchange for almost no release at all.

13       The settlement occurred as contentiously as
14  any of them have with Equifax.  You have a bunch of
15  lawyers that essentially make their living prosecuting
16  consumer claims against this defendant.  We were in
17  front of a retired Eleventh Circuit Court of Appeals
18  Judge on multiple exchanges for settlement, but
19  multiple mediations in Atlanta, and we accomplished,
20  in my view, what is an excellent settlement.  It is
21  certainly the best that we believe we could get, but
22  independent of that, in our view, was well past the
23  point when we thought when we started the case that's
24  what we want to accomplish.

25       The alternative --

1    THE COURT:  Can I interrupt you just briefly,

2  Mr. Bennett?

3    MR. BENNETT:  Yes.

4    THE COURT:  There are a couple references in

5  your filing to an Eleventh Circuit retired judge, but

6  also to Rodney Max, mediation with Rodney Max.

7    MR. BENNETT:  We did not have a mediation

8  with Rodney Max.

9    THE COURT:  So that is in error.

10    MR. BENNETT:  That is in error.

11    THE COURT:  It's Stanley Birch, correct?

12    MR. BENNETT:  It is Stanley Birch.

13    THE COURT:  So whenever you refer to Rodney

14  Max, which I think is twice, you meant Stanley Birch?

15    MR. BENNETT:  We did.  Although, the Court is

16  aware of the companion or similar case, the *Clark vs.*

17  *Experian* matter, where we prosecute the same fact

18  pattern, and that is mediated by Rodney Max, which has

19  nothing to do with this case other than an explanation

20  for how Rodney Max might be in a drafter's brain.

21    THE COURT:  All right.

22    MR. BENNETT:  But we did have Stanley Birch.

23  I will say that Rodney Max, had he been the mediator,

24  is pretty exceptional as well.

25    In this case, Judge, the Court is required to

make a decision as to the *Jiffy Lube* standard of whether the settlement is reasonable and adequate, and whether it's fair. The first is substantive. The second is process. I've covered both categories.

As far as the process, the fairness, the fairness here is that you had an informed set and a knowledgeable set of attorneys seeking to represent the class that know this field.

I don't mean to appear arrogant, but those three lawyers alone, they are more published in complex FCRA litigation than anyone else in the country or any other firm in the country as well. And I think that we've done -- I have done a good job of prosecuting such cases myself.

You have a long history of litigation where we know where the bodies were buried. We knew the documents, what evidence we would need for class certification. It was no missing information. Even the specific data, the numbers of class members, and the ability to prove and identify those class members, we obtained.

As to other elements of fairness, we had an impartial mediator, a well-respected federal jurist, a retired jurist.

The issue of attorney's fees was actually a

1  totally separate mediation.  I will come before you
2  and hopefully 100 percent of the time in my career I
3  will be able to say we refused to negotiate attorney's
4  fees until we had a handshake on every other term.

5       Here I can say not only that, we even do it
6  in the same month.  It was after we had settled
7  everything else we came back for a separate mediation,
8  and it's not simply a pretend or feigned threat.  I
9  have settled, my firm has settled, class cases in this
10 courthouse where we agreed to prosecute our fees by
11 separate fee petition, and have done so.  And we
12 certainly would have done it here, and the defendant
13 would have opposed, and we would have argued that
14 we've given 3 million people $270 of value, and we
15 want a much higher fee.

16      The defendant would argue all that it may,
17 but at the end of the day we faced uncertainty, and so
18 did Equifax, and we agreed to the 2.8 million ceiling.
19 It is all paid by Equifax, and it includes all of our
20 costs.

21      The first *Jiffy Lube* question is reasonable
22 and adequate.  And that, of course, I've addressed.
23 It's a balance between what the class is giving up and
24 what the class gets.  And the class gets significant
25 injunctive relief.  Every one of these individuals

1    that would have a problem with their public record now

2    has a path to do something about it.  The relief of

3    the credit monitoring product.

4        In addition, merely sending the notice to

5    3 million people and giving them the phone number on

6    the website of our, all of them are relatively small,

7    law firms, and staffing all of the calls to help

8    people with everything from how do I get this judgment

9    off my record to tell me about the settlement was

10    consideration itself.  These folks have learned about

11    their rights in a way they might not have before, and

12    they all now know that LexisNexis is the furnisher.

13        The settlement, Judge, we think is fair.  I

14    would like to answer any particular questions the

15    Court may have as to objections and separately argue

16    our attorney's fees.

17        THE COURT:  All right.

18        MR. BENNETT:  Do you have any questions for

19    me now?

20        THE COURT:  The questions I had I asked about

21    the nature of the mediator.  And the objections,

22    you're resting on what you filed in your papers; is

23    that correct?

24        MR. BENNETT:  That is correct, Judge.

25        THE COURT:  All right.  So I have reviewed

everything.  Okay.  Thank you.

MR. BENNETT:  May I argue attorney's fees or would you like to hear the other side?

THE COURT:  I would like to give Ms. Sumner am opportunity to present whatever she wishes, and then we can talk about fees.

MS. SUMNER:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. SUMNER:  I would just simply say, Your Honor, that we are in agreement as to the reasonableness and the fairness of the settlement, and I do want to underscore that this was a long, negotiated process.  We had many conversations pre-mediation.  We had many conversations about the information, about what discovery would look like. Both parties knew full well where we were headed if we went into litigation, and it would have been prolonged and hotly contested because I think Your Honor knows Equifax's position about this.

We do think that this is a technical issue. We believe that Equifax has been in compliance with the law, but we recognize that plaintiffs' theory, we would have some risk in proceeding forward and determined that we would take the steps to make an operational change.  And, as you know, that is no easy

thing for a company of Equifax's size that manages the
amount of data that it does on a daily basis to agree
to make a change.  And it in fact did that and that
process is something that is in the works.  We have 90
days after your approval in order to implement that,
and our goal is to try do get that accomplished by the
end of this year.

So that is a significant benefit that the
class members are receiving in terms of injunctive
relief.  And then, of course, we do believe and agree
with Mr. Bennett that the credit monitoring service is
a significant benefit, and we've already seen that
there are a large number of class members who have
indicated by returning their email addresses that they
are interested in receiving that product.  And we are
also leaving that opportunity open so they have more
time to take advantage of that product as well.

So, Your Honor, I am happy to answer any
questions.  There was one objector, Mr. Donahue, who
made some allegations with respect to defense counsel.
I'm happy to address that if you would like me to do
so.  He is the one who wanted, I think, both
plaintiffs' counsel and defense counsel to contribute
to his wardrobe allowance to allow him to attend the
fairness hearing here in person.  We filed a very

1    brief response to his objection.  I'm happy to answer

2    any questions that you may have.

3              THE COURT:  I have read through his

4    objections and the others, and unless you have

5    anything to add, I don't have any questions about

6    that.

7              MS. SUMNER:  No, Your Honor.

8              THE COURT:  All right.

9              MS. SUMNER:  Thank you.

10             THE COURT:  Let me just be clear that it's

11   the case that if this settlement is approved, and a

12   consumer seeks the credit monitoring, they can have it

13   for 18 months; is that right?

14             MS. SUMNER:  That's correct, Your Honor.

15             THE COURT:  But the option to consider that

16   is open for six months; is that correct?

17             MS. SUMNER:  That's correct.

18             THE COURT:  And their option to keep it open

19   for six months, how do they find that out, you know,

20   so they have time to decide?

21             MS. SUMNER:  Well, that's indicated in the

22   information that they have.

23             THE COURT:  Okay.  I just wanted to be sure.

24             MS. SUMNER:  Yes.

25             THE COURT:  All right.  Thank you.

1        MS. SUMNER:  Thank you.

2        MR. BENNETT:  Judge, if I could follow-up to

3   Ms. Sumner's point.

4        In addition, for those consumers for whom we

5   have a valid email address, which is not quite half

6   but is a significant number, a second notice is

7   actually going out.  In addition to that, all of our

8   offices on the plaintiffs' side are fully staffed.

9   All of our individuals are trained.  We took these

10  calls ourselves.  They spoke to lawyers.  They

11  escalated up the chain.  So if they just said, "How do

12  I get a printout copy of this?" or "Can I get a copy

13  of my credit report non-electronically?" then those

14  were routine issues that our paralegals would work

15  out.  It escalated all the way up to "I have a problem

16  with my credit report," in which case our commitment

17  is that we would try to help them resolve it without

18  putting on our plaintiff's contingency hat, and we

19  continue to do that, and we will be doing that here on

20  out.  I'm on the record in writing saying it and you

21  have me here.

22       One of the objectors suggests, I believe

23  Mr. Sweeney, suggests that, even though it's

24  unconventional, that the Court not approve the fee or

25  allow for the payment of the fee until the end of the

1   case to show we've done our job.

2          The two problems with that are, No. 1, we

3   will do our job, and we will report back to the Court

4   as we have in all our class cases about any anomalies

5   or problems or otherwise.  And, second, a case like

6   this isn't going to be over for many, many years.

7   These are individuals that all now know that Len

8   Bennett's office, (757)930-3660, you call if you have

9   a problem with your credit report.  And given that

10  we're not taking these cases as a fee generator, that

11  public service is paid for if our fee is approved, but

12  it is also a fairly wieldy or often unwieldy part of

13  what we do, and we will continue to make our best

14  efforts to do that.

15         With respect to the attorney's fees, one

16  thing I didn't point out, Judge, in following up with

17  that is the notice process.  So here we had good email

18  addresses both from Equifax and the contacts of people

19  who had contacted Equifax that way, and then

20  purchasing them from LexisNexis in the class

21  administration process.  For those individuals either

22  had emails kicked back or from whom we couldn't get a

23  valid email, they all received a mailed notice.  Then

24  you also had, although I think that the settlements

25  we'll put in front of you, we always see this, but

1  maybe some others maybe you won't, and you should ask

2  this question, is there has to be a follow-up so that

3  when you get this big chunk of mail back about a week

4  after your first mailing, some of the envelopes will

5  say "no address found" and some will say because the

6  forwarding order has expired "here's the new address,

7  but we're not forwarding it."

8           So in this instance, we did address scrubs

9  for the no-address available.  And, unfortunately,

10  only about 21,000 out of 100,000 roughly rejected mail

11  had new addresses that we could find by purchasing

12  them.  And then we found -- we forwarded all of the

13  forwarding address-expired folks.  And so we had all

14  of that -- we had really three levels of boots and

15  suspenders notice in addition to the Internet

16  publication of this new quick enough to Google Equifax

17  class action now or Jenkins, the class website is

18  there, and has the information that we've already put

19  in our papers.

20           With respect to the attorney's fees, Judge,

21  the *Barry* case, if the Court has not blocked it out of

22  its institutional memory, was a case that this Court

23  at the magistrate level considered and vetted for

24  approval before we then took it to Judge Spencer, and

25  then took it to the Fourth Circuit, and then took it

to the United States Supreme Court.  Judge Spencer and
the Fourth Circuit issued opinions rejecting
objections to the attorney's fees, amongst other
things.  The Supreme Court issued a one-line order
"not granting cert."

We've cited in the block quote what I think
to be from the *Barry* notebook at document No. 64, page
28, the Fourth Circuit's consideration of a fee that
in a 1681(b)(2) (b)(3) hybrid case where there was a
limited release, and in that case they released
statutory damages.  Here we don't.  But in that case,
they as well released the class action remedy.  The
attorney's fee was sought.  It was to be paid entirely
by the defendant.  LexisNexis there.  It was
negotiated independent and after the class relief, and
the Fourth Circuit analyzed the applicability of a
multiplier, the permissibility of a multiplier over
lodestar.  And, of course, the Court has read the
block quote at Note 10, but in *Barry*, the Court
approved the multiplier.

The Fourth Circuit overruled or rejected the
objections to that.  And a couple of the reasons
supported it.  Number one, obviously it was to be paid
entirely by the defendant.  So there was no tradeoff
between class and -- which is the Court's really

1   fiduciary charge to protect.  And, second, the fee was
2   negotiated separate and independent and after so that
3   the Court didn't have any basis and shouldn't and
4   certainly in either of these cases to believe that
5   there was any quid pro quo, that we would negotiate
6   low now because later on they would give us a break on
7   something else.

8          In this case, it's even more than *Barry*.  I
9   don't know how given what we were attempting to
10  negotiate there could have been such a tradeoff
11  because there wasn't the cash component, and there's
12  not a release of cash-based monetary claims.  But we
13  believe the fee, Judge, if just 5 percent of the class
14  activates just the monetary relief, not trying to
15  value we make the world a better place, the esoteric
16  part of the relief, just the credit monitoring at
17  5 percent, our fee would be less than 10 percent of
18  that economic value.

19         And it is already just amongst individuals
20  that have already sought to activate affirmatively
21  reaching out even though it's prior to the deadline,
22  the approval, and they haven't received the second
23  notice, itself would be far less than the 25 percent
24  that is customary in comparing the monetary value to
25  the fee.

1    We have worked to date for all of us quite a

2  good deal.  You've seen the fees.  They are in excess

3  of $500,000 in total time over the year and a half in

4  this case and the related time just for Equifax prior.

5  But we will have a significant lodestar moving

6  forward.

7    If the Court asked me in a year whether or

8  not I thought this was such a great deal, maybe I

9  won't say so.  But we're committed, we're on the

10 record, and we've proven, all of us, in our track

11 record of our public interest in helping consumers

12 with these types of problems.  So we are bound by it

13 and our lodestar will only continue to grow where our

14 fee will not.

15   I don't have anything else unless the Court

16 has any questions.

17   THE COURT:  No.  I well remember the *Barry*

18 case, and I have reviewed your fee petitions, and

19 everything that you have set forth in your filings,

20 and I'm aware of where you all stand on the matter.

21   MR. BENNETT:  Yes, Your Honor.

22   THE COURT:  So I'll hear -- to the extent Ms.

23 Sumner wants to put anything on the record, I'll hear

24 from her.

25   MS. SUMNER:  Your Honor, my only comment is

1  that these were fees that we negotiated.  I can say

2  that certainly Equifax was looking to pay less fees

3  and plaintiffs' counsel were looking to receive more

4  fees, and after spending quite a bit of time

5  negotiating this and looking at the value of the

6  settlement to the class members, this was an agreed

7  amount and appropriate under the circumstances.  So we

8  support the request at this point and have agreed to

9  pay that amount.

10         I do want to make one clarification just

11  because I want to be precise in terms of what I said

12  to you about the six-month window.  That's not in the

13  actual notice.  It does -- the notice itself reflects

14  that they will receive an email activation code that

15  they can use to sign up for 18 months, and that if

16  they already have a subscription, that they can extend

17  it for another 18 months.  So we will check to make

18  sure that that six-month window is apparent in the

19  website, but it's not in the actual notice itself.  So

20  I just wanted to be clear since I had commented on

21  that six-month window previously.

22         THE COURT:  All right.

23         MS. SUMNER:  Thank you.

24         THE COURT:  Mr. Bennett.

25         MR. BENNETT:  Yes, Judge.  I'm an agreeable

1  person in court.  I try to be.  Defense lawyers

2  sometimes see a different side of me that -- and this

3  particular issue maybe we should reveal to the Court.

4  My concern once we received the Sweeney objection, the

5  Donahue objection, which talked about the time, 30

6  days is more than the law.  The law has recognized it.

7  But there were a series of hot emails from me seeking

8  in communications, and I say to the Equifax's credit,

9  it agreed to extend the period of time, the six-month

10  period.  It agreed to permit anyone who opted out or

11  objected through today or through fairness 2(b) opted

12  out, and the objections the Court could consider as

13  untimely, but it was agreed, and I appreciate

14  Equifax's handling of that, but the Court should know

15  it was additional consideration.  The negotiations

16  between the parties continued aggressively even over

17  the last 30 days.  It was not -- we say nice things

18  about each other here, and I think very well of my

19  defense opponents, but we were not simply singing

20  *Kumbaya* throughout this whole process completely on

21  the same page.  We were still contesting one another's

22  positions.

23          THE COURT:  All right.

24          MS. SUMNER:  I will affirm that, Your Honor.

25          THE COURT:  All right.  I have no doubt,

given the length of negotiations and the number of
proceedings I've seen, and the counsel who sit in the
courtroom.

Obviously, I want to confirm there are
individuals in the courtroom.  Are there any objectors
in the courtroom today?  Obviously, there are folks in
the well of the courtroom, but I don't see anybody
standing to indicate that he or she is an objector to
the settlement.

I do want to address the objections, and I'm
going to address them and ask you all to confirm
whether or not you think I've addressed what I need to
address about these objections that have been filed.

The first is with respect to Mr. Sean
Donahue.  Mr. Donahue, I would say that the consistent
theme of his objection is that the settlement is meant
to or should compensate class members for damage to
their credit, and he takes issue with the fact that
the settlement class members are said to receive only
injunctive relief and a service valued at $269.10.
Essentially, it appears that his theory is that the
settlement class members will not receive monetary
compensation because in some respect, class counsel
has manipulated the settlement so that it benefits the
attorneys in terms of fees at the expense of the class

1  members themselves.

2  　　　　He also appears to suggest that, frankly,

3  presuming that Sean is a man, he suggests that class

4  counsel has misled class members about their

5  opportunity to object, and then he is seeking

6  compensation so that he can present his objection in

7  an appropriate manner.

8  　　　　First, he suggests that the notice was mailed

9  late and omitted any reference to the class member's

10  right to object.  I'm going to address the

11  appropriateness of the notice later, and I find that

12  it was an adequate notice, but Mr. Donahue appears to

13  misapprehend the nature of the notice itself.  It's

14  clear that it indicates that a potential class member

15  could provide Equifax a valid email address in order

16  to obtain the free credit monitoring.  It gives an

17  indication of a website, and it also offers a more

18  complete notice and other important documents.  And,

19  importantly, it also gives a direct phone number where

20  you can call to get the necessary information.

21  　　　　The website itself explains that the class

22  members may object or exclude themselves from

23  settlement.  And I do find that the notice to object

24  is readily accessible to the class members, and any

25  additional notice would not be necessary and would

incur undue expense in that it would be superfluous.

He suggests, Mr. Donahue, that the notice values the Equifax service at $270 while it's really only worth $269.10, suggesting that he would drop his objection with respect to this defense in exchange for either $100,000 cash or an award to him that equals the sum of 90 cents per class member.

He also suggests that he is offering to become a class representative but has reservations about the $5,000 proposed service award and seeks something closer to $50,000 for all the class representatives, including himself. That also is denied.

The members, the injunctive relief that has been negotiated for the reasons that I will say in a full and fair fashion, adequate fashion, by the parties is not meant to be transferred into a monetary value. He does not present any persuasive argument as to why any class members or he should receive the additional 90 cents simply because the notice cited an even number with respect to the value of the service. And, importantly, if Mr. Donahue believes that he has suffered actual damages, the release in this class does not preclude him from pursuing such relief. That really is the largest aspect of what makes this class

a full and fair settlement on behalf of each member,
which is that it gives them the advantage of this
non-monetary value of injunctive relief and they give
up nothing as far as individual causes of action.
Clearly, they give up an opportunity for a second
duplicative class, which is, frankly, not giving up
much relative to what an individual member could give.

It appears that he is suggesting a
court-funded stenographer for purposes of the toll
free telephone messages to be transcribed and
submitted to the Court.  I'm denying that request.
There's really no basis for it; the content that he
has suggested needs to be transcribed.

As far as their participation in it, it is
available to any class members if they wish to call up
the number and find out the information on it.

He has sought sanctions both against class
counsel and defense counsel.  He suggests that with
respect to class counsel that sanctions include their
removal from the case.  For the reasons that I'm going
to indicate that I am going to approve this proposed
settlement and for the reasons that I've already
articulated with respect to the preliminary approval
hearing, class counsel certainly has provided adequate
representation, and that finding was made in great

detail under Federal Rule of Civil Procedure 23(g),
and I will make later findings with respect to the
amount of work dedicated to the settlement reached as
well as class counsel's competency in like matters.

Simply put, Mr. Donahue's personal
dissatisfaction with the settlement is no basis to
levy sanctions against class counsel, which I am
finding not a great basis for his personal
dissatisfaction in any event.

With respect to defense counsel, he also
appears to seek sanctions because there is some basis
for a finding that this settlement was favorable to
Equifax and somehow that they held some duty to
protect his interest.

This clearly -- again, he seeks counsel's
removal from the case.  This clearly is not -- I'm
going to summarily deny that as well.  Clearly,
Equifax does not represent Mr. Donahue, and it really
doesn't owe him any duty of loyalty.  In fact,
Mr. Donahue technically is adverse to Equifax and to
the interest that they must look out for, which is for
any shareholders or other individuals.

He clearly retains his right to object to the
settlement.  There's no really legal basis or factual
basis for him to do so, however, and, once again, he

1  can still maintain a cause of action on any individual

2  claim he might want to bring with respect to his own

3  credit experience.

4       His motion to continue the case to implement

5  sanctions is certainly denied.  He requests a 365-day

6  continuance to fully inform the settlement class

7  members of their right to object, and, clearly,

8  although it is a low number of objections that have

9  been received in this case, the high amount of

10 responses, which I will address later, suggest that

11 there is plenty of notice with respect to the class

12 circumstances itself, and the fact that there are a

13 number of objections indicates that the notice is

14 adequate for that, including Mr. Donahue's own notice.

15 And so the notice to continue is denied.

16      He did ask to attend a fairness hearing under

17 different circumstances.  And the Court found his

18 filings adequate for purposes of this hearing itself,

19 and he did not seek in any other way any other measure

20 to attend the hearing electronically given that his

21 filing was also in tandem with the filing requesting

22 defense counsel to pay his travel, lodging, board,

23 spending cash, dry cleaning, and the cost of

24 purchasing two business suits and numerous

25 accessories.  The Court certainly denies those motions

and saw no follow-up otherwise. And he adequately
presented his position in his papers so that no
further oral argument was required, nor did he
separately request it.

He did ask for $5,000 in legal fees, and
given that Mr. Donahue's objections appear to have no
merit, the Court is denying his request for pro se
legal fees to the extent it is even available under
the law. So Mr. Donahue's objections are overruled.

Mr. Daniel Rubin objected essentially because
there was no cash option, and the Court is overruling
his objection. The fact that the class members cannot
choose a cash option over the injunctive relief,
specifically whether or not they can earn $270 rather
than have an option to receive this credit monitoring,
is overruled largely because of the preservation of
the personal cause of action that any individual class
member can bring.

They do not release any claims for actual
damages, and so to the extent Mr. Rubin or others
believe they are entitled to it is not a basis to
object to this because they are in fact, through this
class, getting benefits in addition to what could be
any cash benefits that they think they are entitled to
under the law.

1    Ms. Kelly Roosa objects essentially on bases

2    that are objections to issues that she has with the

3    credit reporting agencies or industry in general, and

4    speaks largely of what appears to be a mortgage

5    transaction that caused her financial hardship.  And

6    while the Court understands or at least takes note of

7    Ms. Roosa's concerns and the nature of what she says

8    that the public was duped and found left with big debt

9    and no income, these are not factors that are raised

10   in this class at all, and it is not the purpose of

11   this class or remotely within the scope of this class

12   to address the issues that she raises in her

13   September 20th letter at ECF No. 43, and so that

14   objection will be overruled as well.

15       I'll note on the record that Mr. Rubin's

16   objection was ECF No. 42, and he appears to have

17   signed his objection on September 6.

18       The next objection that the Court will take

19   up is that of Mary Lynn Cords.  That's ECF No. 45.

20   And she appears to have filed it on or about

21   September 26 of 2016.  The upshot is that she's

22   objecting to receiving this 18-month subscription

23   saying it doesn't really amount to any benefit.  I'd

24   rather get the settlement in cash of $270.  And for

25   the same reason that Mr. Rubin's objection is

overruled with that respect, Ms. Cords' objection will
also be overruled.  She has not released, nor does
this class, or participation in this class release her
ability to seek any actual damage that she has
incurred.

Objection 52 from Edna Reed, which is dated
September -- excuse me.  It's ECF No. 52, an objection
from Edna Reed, also raises the fact that there is no
cash option.  That was filed on September 23rd, and
that is overruled for the reasons stated with respect
to the previous two objectors.

Mr. Bezer's objection, B-E-Z-E-R, ECF No. 53,
appears to be an objection largely based on attorney's
fees, that it must be based on the approximate value
of the settlement benefits for which the settlement
class members actually submit claims and seeking a
continuance to establish that.  The Court will
overrule that objection for part of the reasons that
Mr. Bennett articulated here, which is that even if
the Court were to assess fees in proportion to the
value of the credit monitoring services that have been
activated already, the fee requested is within norms
that are established as appropriate and fair under
binding Fourth Circuit law and, as I will later find,
based on the facts of this case itself.

1    I also will note that the 30-day deadline as
2  far as objections which Mr. Donahue raised and which
3  Mr. Bezer raises is simply too short, both under the
4  facts of this case given the follow-up and the
5  adequacy of the notice, which I will make findings of
6  with respect to, but also under the law, which is
7  binding in this case.

8    And so for those reasons, Mr. Bezer's
9  objections will be overruled.

10    MS. SUMNER:  Your Honor?

11    THE COURT:  Yes.

12    MS. SUMNER:  Just for the record, he actually
13  provided two objections and the second is document
14  No. 68.

15    THE COURT:  Uh-huh.  I think I need a copy of
16  document 68.

17    Right.  So excuse me.  Document No. 68 is
18  essentially what amounts to a reply from Mr. Bezer
19  where he again suggests that attorney's fees must be
20  based on the approximate value of the settlement
21  benefits, and here he is unhappy with, among other
22  things, that the benefits are non-monetary in nature.

23    Importantly, with respect to both Mr. Bezer
24  and with respect to Mr. Donahue, nothing in the
25  settlement prevents them from pursuing their own

1   monetary claims.  And so for those reasons, the Court

2   is overruling both aspects, essentially his reply,

3   Mr. Bezer's reply, and Mr. Donahue's reply in ECF

4   No. 65 where he corrects what he thinks are some

5   issues that are brought up, which are nonmaterial, by

6   counsel in response to his objection, and also seeks

7   additional time for continuance for what he says is

8   the necessary notice using social media and other

9   means.  And the Court will find for the reasons with

10  respect to the settlement itself, that that is

11  unnecessary and inappropriate given the nature of the

12  settlement.  And so that will be overruled, that

13  objection as well.

14          With respect to Mr. Sweeney, which is

15  objection number -- it's ECF No. 55, Mr. Sweeney

16  raises issues as to timing.  He wants assurance that

17  the settlement be carried out, and he indicates the

18  objection period is too short.  He objects to the

19  amount of attorney's fees and that there is no cash

20  option.

21          First, counsel have established appropriately

22  that Mr. Sweeney appears to be an individual who

23  presents himself in a serial fashion to class cases.

24  Sometimes even when he is not a member of the class.

25  That at least provides insight into the nature of his

1   objections in the first place.  But regardless of what

2   he has done in other cases and what other courts have

3   found with respect to his presentations in other

4   classes, the objections he lodges lack merit.

5           The Court will retain jurisdiction to enforce

6   the settlement agreement.  The 30-day deadline is not

7   too short under the law or the facts of this case as

8   far as objections.

9           Any inability to speak in person at the

10  settlement itself or the telephone number does not

11  necessarily make it inadequate.  He doesn't

12  necessarily provide a basis for suggesting that it

13  must be available and class counsel provide the

14  settlement class members with their firm's contact

15  information.  And that, of course, is the most

16  important factor in assuring that the settlement be

17  adequately pursued and class members be assisted.

18          It is the case that counsel has stood here

19  and indicated the amount of time that they are willing

20  to put in as to individual cases and assistance that

21  they are offering to help, and it is the case that

22  this Court is aware that that will incur additional

23  time and services that the Court will find

24  appropriately calculated into the fees that are

25  assessed for this case.

1        Certainly, it is the case that the Court will

2   make finding as to the adequacy of the fees based on

3   the amount already of individuals expressing interest

4   and participating in the class.  And as previously

5   found, it is not the case that the fact that the class

6   members did not receive cash is a basis for not

7   awarding fees or enforcing the settlement.

8        Class counsel here has obtained an injunction

9   based on a strongly negotiated settlement process with

10  an Eleventh Circuit judge under circumstances that the

11  Court will find to be well within the appropriate

12  factors under Rule 23 and class fairness principles,

13  and so for all of those reasons Mr. Sweeney's

14  objections will be overruled including, obviously, the

15  fact that the plaintiffs have negotiated a class where

16  individuals do not release their individual claims.

17       As far as I can tell, Mr. Robinson's

18  objection, ECF No. 56, amounts to an opt-out.

19  Ms. Blackman's objection, ECF No. 57, also appears to

20  be an opt-out, so not technically an objection.

21       The Court has Vionca Jason's acknowledging of

22  late objection but expressing her displeasure of the

23  attorney's fee award in comparison to the benefits

24  afforded to the settlement class members.  She asks

25  the Court to reconsider the distribution of funds as

proposed, which even presuming the objection were

timely filed, the Court will not do so for the reasons

substantively that the Court finds that the class

settlement meets all the standards required for class

fairness and for appropriate administration of the

class members itself.

So those are all the objections that I have

lodged.  Does that match with what counsel has?

MR. BENNETT:  Yes, Your Honor, that's all

that we have as well.

THE COURT:  All right.  So as I have

indicated, I have reviewed thoroughly the filings that

you all have presented to me, and I am going to make a

finding that this class is appropriately settled.

I propose to enter an appropriate order to

that end, but it certainly is the case that this 15

U.S.C. 1681(g)(a)(2) class claim is appropriately

settled given the nature of the proposed settlement

that is before the Court.

The Court notes that as settlement

negotiations began, and were indeed finished before

Equifax filed an answer in this case, but the

memorandum in support of the motion for preliminary

approval for a class action that at all times during

the pendency of this case Equifax has vigorously

1   denied all claims asserted against it and continues to

2   do so in person with able counsel in this court

3   representing the interests of its clients and noting

4   on the record here that it continues to believe it is

5   a technical violation, but nonetheless is offering a

6   change of the business practice in order to move

7   forward in this case and in its business practices.

8           As far as a risk of continued litigation,

9   certainly the plaintiffs' risks include that continued

10  litigation would pose the risk associated with any

11  case, but the cost of the possibility of unfavorable

12  dispositions, and those risks are heightened by the

13  fact that there's not even an answer in this case, and

14  the parties would have to begin from square one if

15  they were to begin litigating at this point.

16          The defendants certainly have the same risks

17  that would be associated with the case, and so both

18  parties face an adverse result after years of working

19  on this case itself, and that is something the Court

20  takes into consideration as it views what the parties

21  have done.

22          This class is defined as all consumers in the

23  United States who within two years preceding the

24  filing of the action until the date of the preliminary

25  approval received a credit file of scores from Equifax

containing a public record.  And I am prepared to make
extensive findings for purposes of enforcing the
settlement agreement, but the important aspects of
this are that it's potentially over 3.2 million
settlement class members and that each of the class
members who the parties are able to identify will
receive credit monitoring service, Equifax's leading
credit monitoring service, for a period of 18 months.
And that does amount to approximately $270 worth of
services, and it includes unlimited and repeated
access to your credit report, which usually is not
unlimited and involves payment after you have received
at least one credit report.  It does not require the
need for any claim forms or financial information, no
credit card needs to be given to activate the
subscription, which is an agreement that greatly
benefits consumers both as far as not having to turn
over financial information and making the signing up
process consumer friendly in that regard.

          The parties have negotiated that they will
send out a secondary notice having already sent out
one notice at a cost of nearly $800,000, and that
notice will provide those individuals, once this is
approved, appropriate and extensive information about
how to sign up for the monitoring service.

1        The plaintiffs and the defendants have

2   offered extensive information about how notice was

3   undertaken.  It is clear that it was through a

4   separate settlement administrator, that there were

5   3.3 million names, 43,000 or a little more than that

6   were duplicative, that there were emails sent, and

7   then a separate summary class notice sent by regular

8   mail, and then those that were returned undeliverable

9   included over 50,000 names that had a forwarding

10  address and then were re-mailed.

11       Equifax also looked up for updated addresses

12  for undelivered notices and an additional more than

13  21,000 addresses were located, and the settlement

14  administrator established a website which had nearly

15  100,000 visits by October 18th of 2016.

16       This results in the settlement administrator

17  reporting a 97 percent effective delivery rate.  The

18  cost of $800,000 as to notice and administration was

19  paid by Equifax, and the class counsel has made itself

20  available to class members who have questions about

21  the settlement, and all of this service was considered

22  in how attorney's fees were negotiated.  Given the

23  fact that the settlement includes a secondary notice,

24  certainly this meets all requirements of the law and

25  is an appropriate and fair notice as this Court has to

1  consider it.

2          Most importantly, the agreement does not

3  release any damage claims, and the only limitation

4  that is at bar is another FCRA class action and that

5  is not something that inures negatively enough or

6  hardly at all to render this to be an unfair

7  settlement under any factors that this Court has to

8  consider.

9          I am cognizant of the extensive amount of

10  settlement negotiations that the parties have

11  undertaken.  The complaint was filed on July 28th of

12  2015.  The case was stayed.  There was a mediation

13  through October, November of 2015.  An Eleventh

14  Circuit judge was engaged through the end of 2015 and

15  early 2016, and it looks as if there are at least two

16  mediations with Judge Birch in 2016.

17          We then held a joint motion for preliminary

18  approval in 2016.  And the Court under extensive

19  findings made its preliminary approval order final in

20  July 7th of 2016 in an amended order.

21          Obviously, we have heard objections and we

22  are now at the fairness and adequacy portion of the

23  final hearing.  Under 23(e), the claims and issues and

24  defenses must be considered under the Court's

25  approval, and the notice has been appropriately sent

1   out, and this Court in open hearing is now reviewing

2   the notice that has been sent out and the fairness of

3   the settlement itself.

4        Under the *Jiffy Lube* case, the Court must

5   consider fairness given the posture of the case at the

6   time the settlement was proposed, the extent of the

7   discovery, the circumstances surrounding the

8   negotiates and the experience of counsel, and the

9   adequacy of the settlement taking into consideration

10  the relative strength of the plaintiffs' case, the

11  assistance of any difficulties approved for strong

12  defenses that plaintiffs are likely to encounter if

13  the case were to go to trial, the anticipated duration

14  and extension of additional litigation, the solvency

15  of the defendants and the likelihood of recovery on a

16  litigated judgment, and the degree of opposition to

17  the settlement.

18       The Court has already made pretty significant

19  findings, but clearly the reasonableness of the method

20  of providing notice for the reasons stated earlier is

21  found to be well within the class action fairness

22  requirements, and given the effective delivery rate

23  that the cost of the notice is borne by Equifax and

24  has not affected the other aspects of the case, and

25  for the reasons earlier stated, the Court finds that

1  the notice is reasonably given.

2      It's certainly clearly and concisely stated

3  in plain and easily understood language based on a

4  review of the notice itself.

5      With respect to fairness, the Court has

6  already addressed that given the early nature of the

7  case, the parties chose to engage in, I am sure at

8  times hotly contested, negotiations especially given

9  the fact that the Court had to issue a record number

10 of stays so that the parties could continue to discuss

11 the matter.  The parties have engaged in document

12 exchange, a thorough investigation of the facts and

13 the claims, and this case really is an upshot of a

14 series of other fully litigated cases including

15 against other providers that then suggest that the

16 parties have fully vetted the issues with respect to

17 the potential class members' interests.

18      With respect to the negotiations, they were

19 monitored by a retired judge of the Eleventh Circuit,

20 as indicated, and this Court is aware of Judge Birch's

21 expertise, and so I have no doubt that he kept both

22 parties on their toes with respect to assuring that

23 every factor was considered by both sides, and every

24 risk considered by both sides, and the ultimate

25 outcome reflects that.

1    In this courtroom are a series of attorneys

2  who are as experienced in this area of litigation as

3  may be available in the nation really on both sides,

4  and my having seen a series of these cases and these

5  litigants in these and other cases, the counsel

6  certainly provided experienced consult to their

7  clients and also positions with respect to the case at

8  bar.

9    As to adequacy, Equifax has disputed

10  plaintiffs' claims as indicated, and the class would

11  have been a numerous class that plaintiffs would have

12  had to try to manage either with respect to negligence

13  or willfulness and would have had to provide

14  sufficient evidence to a jury in order to prevail, and

15  that entails enough uncertainty that this class

16  certainly is adequate for purposes of the *Jiffy Lube*

17  factors.

18    Equifax has disputed the plaintiffs' claims

19  and the record otherwise reflects that Equifax was

20  represented by King & Spalding with litigators

21  experienced in this type of litigation, and both sides

22  have represented to this Court that this independent

23  and neutral mediator brought to each side an

24  indication of where their risks lay and brought into

25  account for them the difficulties of proof or defenses

1   that each side would have to bear.

2       The additional expenses that might be

3   incurred in litigation I have already addressed

4   including that it would have to start over, but also,

5   of course, we would have to undergo motions for class

6   certification, and for summary judgment, and possibly

7   even two-phase litigation including interlocutory

8   appeal or a different appeal at the end of the case.

9       Certainly, Equifax is solvent and can pay a

10  reasonable judgment, but in this case, given the size

11  of the class, and the fact that the plaintiffs were

12  operating under, and the defendants ultimately

13  agreeing to, a business change, the fact that must

14  incur an extensive amount of money, both setting it up

15  and continuing it over time, it is not clear to this

16  Court that a meaningful cash settlement on top of that

17  would have been appropriate.

18      Of the 3.1 million individuals in the class,

19  the Court sees only about seven objections.  The

20  parties have notified the Court that only 176 class

21  members have opted out.  And certainly that low level

22  of opposition given the high effort and successful

23  effort at notice that the parties have placed before

24  this Court certainly favors a finding of adequacy,

25  which this Court finds.

1    With respect to the $2.8 million in
2 attorney's fees, the Court will approve that amount.
3 The Court notes that Equifax does not oppose the
4 amount, although Equifax is clearly not jumping up and
5 down at the amount, but it is an amount that is
6 appropriate given the nature of this case that is
7 before the Court.

8    First and foremost, it does not reduce the
9 recovery of the class, and that really is maybe nearly
10 all this Court has to say with respect to the amount
11 of attorney's fees, but it is a large amount of fees,
12 and it doesn't involve monetary relief to the
13 plaintiffs, and so the Court knows that in the Fourth
14 Circuit, attorney's fees in common fund cases are
15 typically awarded on a percentage of the recovery
16 basis.

17    Under the *Manuel v. Wells Fargo* case, at
18 least one Court has noted that the Court does have a
19 preference for a percentage method in addition to the
20 absence of any objection to the fee award.  The Court
21 need not necessarily go through an exhaustive review
22 of each of the 12 lodestar factors, and I will not do
23 so for purposes of this case.  Having selected a
24 percentage method, the Court must determine the
25 reasonableness of counsel's request with respect to

1  the amount that they are seeking.

2       And here the settlement value is essentially

3  a $270 settlement value per class member of the credit

4  monitoring.  The cost of notice, the value which is

5  hard to assess, frankly, of the changes to Equifax's

6  policies but may be the greatest upshot of the

7  settlement for purposes of consumer litigants and the

8  attorney's fees forfeited in helping class members to

9  resolve the disputes beyond the litigation, which this

10  Court takes these lawyers well at their word that that

11  will involve as much time as it requires per consumer

12  who calls in.

13       So even if the Court were to assess, as I've

14  already stated, the settlement value conservatively,

15  even assuming that only 5 percent of the class will

16  actually activate the service, the fee sought will be

17  less than 10 percent of the settlement of the value

18  obtained.

19       The class counsel has agreed to forgo any

20  Equifax class action in the future with respect to, or

21  at least for a year, with respect to this very case,

22  and if the Court were to require it, the lodestar

23  method of the total fee incurred would be based on the

24  affidavits that I have in front of me, approximately

25  $750,000, and the $2.8 million settlement would

1   reflect a multiplier, if the Court were to undertake

2   that evaluation, between three and four.  And even

3   that would be reasonable and within the range of

4   similar awards in similar cases.

5        So the Court certainly finds that the

6   2.8 million agreed upon figure, especially given that

7   it was negotiated separately and apart from the class

8   settlement agreement itself, reflects a reasonable and

9   appropriate fee award in this case.

10        Finally, the service awards represent the

11  representative plaintiffs' work and their support of

12  the class as well as their promotion of the public

13  interest, and the class representatives here have

14  learned the theories of the law suit and have been

15  kept abreast of the status and have reviewed

16  documents, and certainly the cases cited by

17  plaintiffs' counsel demonstrate that 5,000-dollar per

18  plaintiff service awards are regularly approved in the

19  Eastern District of Virginia, and the Court will make

20  that award in this case as well.

21        So I am prepared to enter for the reasons

22  stated from the bench and the reasons articulated

23  elsewhere your final proposed approval order.

24        Is there anything else that the Court needs

25  to undertake?

1          MR. BENNETT:  The plaintiff doesn't believe,

2     Your Honor.

3          MS. SUMNER:  No, Your Honor.  Thank you very

4     much.

5          THE COURT:  All right.  Well, I, once again,

6     am impressed by the counsel who have appeared in this

7     case.  Certainly I believe I said the same thing

8     during your preliminary approval order hearing, and I

9     reiterate it again.

10          It is rare that you can go through a series

11     of documents, which I also do pretty thoroughly, and

12     see this level of work that has amounted to what I

13     honestly find and believe to be a just resolution of a

14     case.

15          I think that in the end, my hope is that

16     Equifax will think that this change in policy is a

17     good one from a business perspective, it is certainly

18     a just one for the plaintiffs who are included in the

19     class, and that there are 3 million individuals who

20     can benefit from it, but who have also not otherwise

21     given up any other claim they may have strikes me as

22     exactly what our civil justice system is meant to

23     accomplish.

24          So I appreciate your hard-fought and

25     thoughtful outcome, and I will enter the approval

1  order, and I wish you well.

2        MR. BENNETT:  Thank you, Judge.

3        MS. SUMNER:  Thank you, Your Honor.

4        MR. BENNETT:  Your Honor, I didn't -- you

5  already met Jim Francis.

6        THE COURT:  Yes.

7        MR. BENNETT:  I was rude in not pointing out

8  his trip from Philadelphia.  You already know Kristi

9  Kelly who is busy beating our firm out as the top

10  consumer law firm in Virginia, and my partner Matt.  I

11  don't know if you met Craig Marchiando, who he used to

12  work for Caddell & Chapman, the well-dressed counsel I

13  had in the *Barry* settlement conference, but he now

14  works for us.  And we have for some reason a federal

15  public defender sitting here, who I think we're trying

16  to lure.

17        THE COURT:  So there's poaching going on

18  everywhere.

19        Well, it's great to meet you all.  I do want

20  to shake your hands and thank you for your time.

21        (Shaking hands.)

22        THE COURT:  Thank you all very much.  Have a

23  good afternoon.

24        (The proceedings were adjourned at 3:30 p.m.)

25

1    I, Diane J. Daffron, certify that the foregoing is

2  a correct transcript from the record of proceedings

3  in the above-entitled matter.

4

5                          /s/
   _____    _____
6      DIANE J. DAFFRON, RPR, CCR        DATE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25